128 Cal.Rptr.2d 282 (2002)
104 Cal.App.4th 487
In re Establishment of Fact of Death of Barry STARR.
Linda Michelson Starr et al., Petitioners and Respondents,
v.
The Old Line Life Insurance Company Of America, Objector and Appellant.
No. A097688.
Court of Appeal, First District, Division Four.
December 17, 2002.
*283 Fleming & Phillips, Robert D. Phillips, Jr., John T. Burnite, Jr., for Appellant.
Schofield & Schiller, Louis F. Schofield, Walnut Creek, Keith S. Schiller, for Respondents.
Certified For Partial Publication.[*]
KAY, P.J.
The Old Line Life Insurance Company of America appeals from an order granting the petition to establish the fact of death of its insured, Barry Starr, filed by respondents Linda Michelson Starr, Starr's former wife, and his sons, Adam and Jeffrey, and appointing respondents personal representatives for Starr's estate. Probate Code section 12401 (hereafter § 12401) provides that "a person who has not been seen or heard from for a continuous period of five years by those who are likely to have seen or heard from that person, and whose absence is not satisfactorily explained, after diligent search or inquiry, is presumed to be dead. The person's death is presumed to have occurred at the end of the period unless there is sufficient evidence to establish that death occurred earlier." The court applied this presumption of death in Starr's case, and found that he died on June 9, 1994, five years after he disappeared. The court erred in applying the presumption because there was a satisfactory explanation for Starr's absence other than his death. We therefore reverse.

I. BACKGROUND
Starr was an engineer, educated at the Massachusetts Institute of Technology and the University of California, who manufactured methamphetamine in the garage of the Orinda home where he lived with respondents. Starr and his wife, respondent Michelson, were arrested in May 1988, and criminal charges were pending against them when Starr disappeared in June 1989. According to the federal complaint for forfeiture of the residence, the drug operation conducted by Starr and his partner Edward Null grossed approximately $1,480,000 from 1986 to 1988. Starr faced federal charges that carried minimum sentences of 20 to 25 years in prison.
In March 1989, Starr was arraigned in federal court and released pending trial, subject to electronic monitoring at the Orinda home. A hearing was set for June 16, 1989, for Starr to post security for bail in the federal case. One week before this hearing, on the morning of June 9, 1989, Starr broke free of his monitoring bracelet and left the house. Michelson and Jeffrey, who was six years old at the time, were *284 asleep when Starr left. Adam, then age ten, recalled waking up early for school, seeing the family car drive away, and finding a note from Starr, which he gave to Michelson. The letter read, "Dear Linda, I am very depressed about the way our cases are going. I need some time to be alone to think things through. Please take Adam to school this morning. Love, Barry." Starr's car was found at the Oakland Airport, and no one in his family ever saw or heard from him again.
On the day he left, Starr sent letters to respondents and to his parents. In his letter to Michelson, Starr wrote:
"... I have not only ruined my life, but I have ruined your life and the children's lives as well. I can never forgive myself for the harm I have done to you and the children. For all the pain I have caused you I deserve to die. In dishonoring you I have dishonored myself, and the only honorable solution is to kill myself.
"Not only do I suffer from the pain of what I have done to you, I suffer from the pain of what they are going to do to me life imprisonment.
"I have been trying so hard to live with this pain since we were arrested, but now that we are getting close to sentencing I just can't bear it any longer. I want to end this pain right now, and I can punish myself for what I have done to you at the same time, by killing myself. It's all very neat except that I don't want to cause the children more pain by their experiencing my death. That is why I cannot kill myself at home or even anywhere where they might find out about it.
"That is why I am going away to find a place to die, I don't even know where. Tell the children I escaped and I am living happily ever after. I think they would like that. Tell them I love them. Don't show them this letter...."
The letter concluded with directions to a will Starr had left in his nightstand, and to the car at the airport.
Starr wrote Jeffrey:
"... my lawyer Stan tells me that they will put me in prison for a very very long time, and he cannot stop them. They will put me [in] prison so long that you Jeffrey will be a grown-up man before I get out.
"That is why I have chosen to flee. I will escape from the police before they come to get me, just as Moses fled from Egypt to escape from Pharoah [sic]. But I can never return home again."
He wrote Adam:
"I have chosen to, flee into exile, just as Moses did to escape the Pharoah [sic]; even as the Jews fled Nazi Germany to escape the concentration camps. I want to take you with me, but it wouldn't be fair to you. I must make this journey alone.
"I can't tell you where I am going because I don't even know myself. I will try to find a way to be safe from the FBI and the police. The worst part is that I can never never return home again."
In his letter to his parents, Starr indicated that his case was going badly, that he would not be eligible for parole for 13 to 15 years even if he pled guilty, and that he considered that prospect "unacceptable." He continued:
"That is why I have decided to flee. This means I can never visit your home or my home or Bob's or Helaine's [his brother and sister] home again. But if I stay and submit to prison, well, who knows who will be well or alive in 13 to 15 years.
"This was not an easy decision for me. Abandoning my wife and children is the very last thing I would willingly do. But if I don't go now the government will make me abandon them in about three months anyway.
*285 "The good news is that the money you put up for bail is safe. For the past two months I have been wearing an electronic monitor in lieu of bail. Since the state charges were dropped in March, Mr. Strasser has been holding the collateral in preparation for a new Federal bail bond, which was never put in place. It was to be posted next week, which is why I am leaving now. I suggest you call him now and get your money back. Thank you for helping bail me out of jail. I had a wonderful 10 months with my family."
Michelson testified that when Starr disappeared he left behind the inhalers and medications he used to control his severe asthma. She said that he always carried pills and an inhaler for the condition, and had feared having an asthma attack during his time in jail after his arrest when he did not have his medication. Starr did not take a suitcase when he left, or any clothing other than what he wore. He took his wallet and keys, but did not take his watch or any family photos. Michelson did not know how much money Starr had with him when he left, but all of the money in the home had been seized when they were arrested, and he did not write checks or withdraw money from their bank accounts after he left. He left some credit cards behind, and did not charge anything on their cards after he left. His passport had been confiscated when he was arrested, and had not been returned before he left.
Michelson testified that Starr was despondent over his criminal case, was seeing a therapist for anxiety and depression, and had talked about committing suicide before he disappeared. She described him as "fairly confused, but overall depressed, anxious and very sad and remorseful," and said that he began talking more frequently about suicide as the June 1989 federal court hearing approached. He was frightened of prison, and worried about the children. He was not eating well and was losing weight. When he once proposed that the family flee together, Michelson dismissed the suggestion, in part because one of their two young boys, Jeffrey, had cerebral palsy. Starr never talked about fleeing alone.
Starr and Michelson had been married for almost 20 years before he disappeared. She said that they had a close and loving relationship, and were caring and supportive parents. Adam and Jeffrey testified that they had been close to their father. Adam recalled times when Starr's asthma had interfered with their activities. Michelson and Adam testified to their belief that Starr was dead. Michelson thought that if Starr were alive he would have attempted to contact her, his parents, or his children to see how they were doing. Michelson did not think that Starr had spoken of suicide to discourage people from looking for him. Adam conceded that Starr could not contact him without risking long-term imprisonment.
Michelson testified that U.S. marshals had been to her home several times in the years after Starr disappeared, and had visited the homes of Starr's parents and brother. She said that her phone had been tapped in their search for Starr. Starr's story was aired on the national television show "Prime Suspects," and viewers were asked to report any information on his whereabouts. Despite these efforts, no trace of Starr was ever found.
Starr executed a will dated July 13, 1988, leaving all of his property to Michelson as the primary beneficiary. He also left behind a "to whom it may concern" letter dated March 1, 1989, stating that he and Null had run the drug operation without Michelson's involvement, and a power of attorney dated May 31, 1989, authorizing Michelson to dispose of his property. In March 1989, Starr requested a copy of *286 appellant's insurance policy, which provided a benefit of $500,000 on his death. When Starr applied for the policy in 1983, he disclosed that he had been diagnosed with asthma as a child, and had been rejected for military service because of the condition. He indicated that his asthma was well controlled with the medications he listed, and that he had never been hospitalized for the condition.
Michelson filed for divorce from Starr in August 1989; in the December 1989 dissolution judgment, the court found that Starr became a fugitive when he disappeared. In November 1989, Michelson pled guilty to aiding and abetting the drug operation, and in March 1990, she stipulated to forfeiture of the Orinda residence, and cash and investments that had belonged to her and Starr. In the early 1990's, she used Starr's power of attorney to dispose of property they had owned in Idaho. At that time, she went to a bank in Idaho where she and Starr had a safe deposit box; Starr had a key to the box, but none of the gold or other property in the box was missing. She kept paying premiums on appellant's policy.
Respondents filed their petition herein in August 2000 to establish that Starr was dead in order to collect on the life insurance policy. Starr was born in 1945, and would have been 56 years old when the petition was tried in the summer of 2001. Respondents argued that the presumption of death applied in Starr's case, and that the date of his disappearance should be fixed as the date of his death. Appellant argued that the presumption of death did not apply because of Starr's status as a fugitive, and that respondents were collaterally estopped from claiming that Starr died on June 9,1989, because Michelson, in her divorce action, had him declared a fugitive as of that date. Appellant also maintained that respondents were estopped from asserting that Starr had died prior to the filing or trial of the petition, because Michelson had given no notice before that time that she thought Starr was dead, and had continued paving premiums on the policy as if he were still alive.
The court filed a tentative statement of decision finding that the presumption of death applied, that there was insufficient evidence that Starr had died on the date he disappeared, and that the date of death was five years after his disappearance, on June 9, 1994, when the presumption arose.
At a hearing on the statement of decision, appellant renewed its argument that the presumption was inapplicable. Appellant conceded that the court "can still rule in [respondents'] favor, on the preponderance of evidence, not giving [them] the benefit of any presumption," but in that event "the date [of death] should be fixed at the time of trial." Respondents reiterated their position that the presumption applied, and that Starr's death should be found to have occurred when the presumption arose or when he disappeared. The court decided that "[a]ll [it would] do is make a finding that [the] presumption applies, period," and declined to find that the death coincided with the disappearance.
The statement of decision reads in pertinent part:
"The petition to establish fact of death is granted. June 9, 1994 is set as the date of death. [¶] ... [¶]
"While the Court is not satisfied the evidence is sufficient to make a finding Barry died on June 9, 1989, there is sufficient evidence to find the presumption contained in Probate Code 12401 is applicable....
"[Appellant's] position that Barry is a fugitive from justice having fled to avoid criminal prosecution, finds some support in the evidence. One could logically conclude *287 that being Barry was unsuccessful in negotiating a plea that would avoid a lengthy prison sentence, he took steps to make it appear he intended to commit suicide, and then fled the jurisdiction, and is now hiding out somewhere, after assuming a new identity and creating a new life for himself.
"However, [respondents'] position that Barry is absent because he is dead is more persuasive as shown by a preponderance of the evidence. In support of this theory, evidence has been produced indicating Barry was extremely close to his parents, siblings, wife and children and yet none of them heard from him after June 10, 1989. In addition, those persons that know him best believe he is dead. Also, before his disappearance the record is clear he had been depressed, frightened, was not eating, saw no way to avoid a lengthy prison sentence, and felt he had greatly shamed himself and his family. He talked of committing suicide shortly before his disappearance and actually wrote a letter to his wife telling her he planned to take his own life.
"A finding of death is further supported by evidence that he had been asthmatic since childhood and required daily medication, and the support of an inhaler and other breathing devices to control this condition. Yet, his medication, inhalers and breathing devices were found in the home after his disappearance; there is no evidence he ever attempted to renew his prescription medicine. There is no indication, in the record, that he had made any reasonable plans to flee or provide for himself after he left. Most importantly, there is no evidence he took any items he would have needed to sustain himself such as, property, cash, credit cards, personal clothing or luggage, and there is no indication that he had purchased an airline, bus or train ticket shortly before June 9th. He had no passport or any other visible means of support, making a finding that he is alive unreasonable.
"Based on the two conflicting theories of Barry's disappearance and absence for over twelve years, the Court concludes his absence cannot be satisfactorily explained and therefore, will apply the presumption of death found in Evidence Code 667 and Probate Code 12401. That presumption of death has not been rebutted by [appellant]."

II. DISCUSSION

A. Presumption of Death

The leading case on the section 12401 presumption is Conservatorship of Geiger (1992) 3 Cal.App.4th 127, 4 Cal. Rptr.2d 252. The court found that there were "three prerequisites for the presumption of death to apply: (1) that a person not be seen or heard from for a continuous period of five years by those persons who would likely see or hear from the missing person; (2) that diligent search for or inquiry about the whereabouts of the missing person be shown; and (3) that the absence of the missing person cannot be satisfactorily explained." (Id. at p. 133, 4 Cal.Rptr.2d 252.) "[T]he party asserting the presumption has the burden of producing evidence to show the presumption applies." (Id. at p. 134, 4 Cal.Rptr.2d 252.) Each of the presumption's prerequisites must be "proved, more likely than not by the proponent of its application." (Id. at p. 135, 4 Cal.Rptr.2d 252.) Here, as in Geiger, the dispute is whether respondents, as the proponents of the presumption, met their burden of showing that Starr's absence "was incapable of satisfactorily being explained." (Id. at p. 136, 4 Cal.Rptr.2d 252.)
"[A] good reason or motive for the missing person's flight" generally provides a satisfactory explanation, other *288 than death, for the person's absence. (Conservatorship of Geiger, supra, 3 Cal. App.4th at p. 135, 4 Cal.Rptr.2d 252.) Since someone who flees criminal prosecution has a good reason or motive for doing so, it will be difficult for a proponent of the presumption to prove that it applies in the case of a fugitive from justice. The presumption thus did not apply in Geiger, where the missing person, like Starr, faced federal imprisonment when he disappeared, and it has apparently never been applied in this state in any case involving a fugitive. (Cf. Ashbury v. Sanders (1857) 8 Cal. 62, 65 [noting that individual who absconded after a felony indictment "had every reason to remain abroad, and to conceal the fact of his existence"]; People v. Niccoli (1951) 102 Cal.App.2d 814, 819, 228 P.2d 827 ["`if the person at the time he was last seen was a fugitive from justice ... or from other causes it would be improbable that he would be heard from even though alive, then no inference of death will be drawn.'"].) While the issue remains one of fact (Conservatorship of Geiger, supra, at p. 136, 4 Cal.Rptr.2d 252), on this record it cannot be said that death was the only satisfactory explanation for a fugitive's absence.
Insofar as it appears from the evidence, Starr may be alive and in hiding to avoid imprisonment. Indeed, the trial court granted as much when it observed that Starr might be living under a new identity. Given that acknowledged possibility, Starr's absence was "[ ]capable of satisfactorily being explained" other than by his death (Conservatorship of Geiger, supra, 3 Cal.App.4th at p. 136, 4 Cal.Rptr.2d 252), and the presumption of death did not apply.
The trial court thought it more likely that Starr was dead than alive,[1] but that is not the test for the section 12401 presumption. The question with respect to the presumption is whether the missing person's absence is capable of a satisfactory explanation other than by death (Conservatorship of Geiger, supra, 3 Cal. App.4th at p. 136, 4 Cal.Rptr.2d 252), not whether death is the most satisfactory explanation for the absence. Requiring the proponent of the presumption to prove that the missing person's absence is "unexplained" has been criticized by a leading commentator. (2 McCormick, Evidence (5th ed. 1999) Burden of Proof and Presumptions, § 343, p. 441, fn. 18.) However, even if we were persuaded of that view, we would be bound to apply the requirement in this proceeding for the administration of a missing person's estate because it has been codified in section 12401. (Compare Evid.Code, § 667 [providing simply that someone "not heard from in five years is presumed to be dead"].)
Whether the missing person is dead or alive is obviously an ultimate issue on a petition to establish the person's death. The presumption presents a different, preliminary issue of satisfactory explanations for an absence other than death, which in turn affects the burden of proof on the ultimate issue of the fact of death. (Conservatorship of Geiger, supra, 3 Cal. App.4th at pp. 134-135, 4 Cal.Rptr.2d 252). If the presumption applies, then the burden of proof rests with the party seeking a finding of life; if it does not apply, the burden remains with the party arguing for death. (Ibid.) The presumption also affects the other ultimate issue on a death petition, namely, when the person died. Appellant concedes that there is sufficient *289 evidence to support a finding that Starr is no longer alive, even if the presumption of death does not apply. However, as appellant observes, the timing of Starr's death could not be fixed, as it was below, on June 9, 1994, because that date depends entirely on the presumption. (§ 12401 [if presumption applies, death is presumed to occur five years after the disappearance].)
Thus, the court's ultimate finding that Starr died in June 1994 was based on its erroneous finding that the presumption of death was applicable, and the error cannot be deemed harmless. The error affected the finding on the timing of death, and may have affected the finding on the fact of death as well. Therefore, a full retrial of respondent's petition, without application of the presumption, is necessary.

B. Estoppel Arguments[**]

III. DISPOSITION
The order is reversed with costs to appellant.
I concur: RIVERA, J. SEPULVEDA, J.
I concur in part and dissent in part. I agree with the majority regarding the estoppel issue; I respectfully disagree with their conclusion regarding the presumption of death.
The majority correctly sets forth the requirements for the application of the presumption of death under Probate Code section 12401 (§ 12401), and the requirement that the proponent of the presumption must prove each prerequisite to its application as being "more likely than not." The only prerequisite to the application of the presumption of death here at issue is the requirement "that the absence of the missing person cannot be satisfactorily explained." Where I part ways with the majority is in the application of the appropriate standard of review to the trial court's determination in this case that the prerequisite in question had been adequately proven by the proponent of the presumption.
In the case heavily relied upon by the majority in reaching their conclusion that this burden had not been met, Conservatorship of Geiger (1992) 3 Cal.App.4th 127, 132, 4 Cal.Rptr.2d 252, the court set forth the appropriate standard of review, stating, "Normally we are bound by the lower court's determination of facts based upon substantial evidence and reasonable inferences drawn from those facts. [Citation.] If different inferences can be drawn from undisputed facts, we must accept the lower court's inference. [Citation.] However, if the court's inference is rebutted by clear, positive and uncontradicted evidence it may not be supported. [Citation.]" The Geiger court goes on to note that we are not bound by the trial court's finding on ultimate issues, where the question is one of law derived from undisputed facts. However, "legal conclusions are only valid if supported by a trial court's finding of fact, which in turn must be supported by the evidence before the court, [and] we [therefore] review both in this case." (Conservatorship of Geiger, supra, 3 Cal. App.4th at p. 133, 4 Cal.Rptr.2d 252.)
In Geiger, upon undisputed facts, the trial court had determined that the proponents of the presumption had not met their burden of proving all the requirements of section 12401, specifically that they had not shown the absence of a satisfactory explanation for the individual's disappearance. The appellate court, applying the correct standard of review, found that this determination was "fully supported by *290 substantial evidence in the record," and properly "decline[d] to substitute [its] opinion for any inferences made from the evidence by that court." Having properly applied the substantial evidence standard of review to the trial court's determination of facts, including inferences to be drawn from undisputed facts disclosed from the evidence, the appellate court affirmed the trial court's decision. (Conservatorship of Geiger, supra, 3 Cal.App.4th at p. 136, 4 Cal.Rptr.2d 252.)
Here we are confronted with the opposite situation. As the majority correctly notes, the trial court (again from basically undisputed evidence) determined that the proponent of the presumption had shown by a preponderance of the evidence that all the prerequisites for the application of section 12401 attached, including the last requirement that "the absence of the missing person cannot be satisfactorily explained." (§ 12401.) The trial court properly considered the evidence presented on this issue, weighed it, and drew the inference that the absence of Barry Starr was not satisfactorily explained within the meaning of section 12401. Specifically, after noting that there was some evidence from which one might infer that Starr was a fugitive who fled to avoid prosecution, the court specifically found that "[respondent's] position that Barry is absent because he is dead is more persuasive as shown by a preponderance of the evidence."[1]
It appears that the majority, its protestations to the contrary aside (see fn. 1, ante), is engaging in reweighing the evidence and overriding the trial court's inferences. While each of us might have reached a contrary conclusion, based on the evidence presented, had we been sitting in the trial court's position, that simply is not within our proper province when sitting as a reviewing court.
Substantial evidence supports the trial court's determination of facts and the inferences drawn by the trial court, and its conclusion that all prerequisites to the application of the presumption of death had been proven by a preponderance of the evidence. I would affirm the order.
NOTES
[*] Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II.B.
[1] Although we cannot reweigh the evidence, many of the facts the court cited, like Starr's shame, depression, and fear of prison, did not tend in reason to make it more likely that he killed himself than fled, any more than did the absence of travel and credit card receipts.
[**] See footnote *, ante.
[1] The majority criticizes the trial court's choice of language, indicating that whether or not it was more likely that Starr was dead than alive is not the test for the section 12401 presumption (maj. opn., ante, at p. 287). I would not read this statement by the trial court as narrowly as does the majority; it appears that the trial court was merely indicating that the proponent of the evidence had persuaded the trial court, by a preponderance of the evidence, that Starr was dead, i.e., that there was not another satisfactory explanation for his absence.